# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **MARVIN RAGSDALE,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **Case No. 1:21-CV-01167-SH** |
| | § | |
| **JLM CONSTRUCTION** | § | |
| **SERVICES, INC.,** | § | |
| *Defendant* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held a bench trial on December 4 and 5, 2023. Plaintiff Marvin Ragsdale, his expert witness, Deborah Ross, and JLM representatives David Marshall and Micah Wheeler testified. The parties have submitted their post-trial briefs (Dkts. 74-76), and the Court heard counsel's closing arguments on February 26, 2024. Dkt. 77. Having carefully considered the briefs, the evidence presented at trial, arguments of counsel, applicable law, and the entire record, the Court makes the following findings of fact and conclusions of law.[1]

## I.   Background

Marvin Ragsdale, a resident of Georgetown, Texas, brings this enforcement action under the citizen suit provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a), against Texas corporation JLM Construction Services Inc. Dkt. 1. Ragsdale alleges that JLM repeatedly discharged sediment-laden stormwater onto his property, in violation of Section 1311(a) of the CWA, 33 U.S.C. § 1311(a).

---

[1] All findings of fact that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

**A.  Clean Water Act**

The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One of the Act's principal tools in achieving that objective is Section 1311(a), which prohibits "the discharge of any pollutant by any person" without a permit into "navigable waters," defined as "the waters of the United States, including the territorial seas." *Id.* §§ 1311(a), 1342(a)(1), 1362(12). The term "pollutant" includes traditional contaminants such as chemical wastes and radioactive materials, as well as more mundane materials such as "rock, sand," and "cellar dirt." *Id.* § 1362(6).

Under Section 1342(a)(1) of the Act, dischargers may obtain a National Pollutant Discharge Elimination System ("NPDES") permit from the Environmental Protection Agency ("EPA") to lawfully discharge pollutants into navigable waters under certain conditions. *Id.* § 1342(a)(1). NPDES permits "impose limitations on the discharge of pollutants, and establish related monitoring and reporting requirements, in order to improve the cleanliness and safety of the Nation's waters." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000). An NPDES permit is required to discharge certain types of storm water into the waters of the United States because storm water "inevitably contains pollutants such as sand or cellar dirt." *City of Abilene v. Env't Prot. Agency*, 325 F.3d 657, 659 (5th Cir. 2003) (citing 33 U.S.C. § 1362(6)).

Under Section 1342(b) of the CWA, "each State may establish and administer its own permit program if the program conforms to federal guidelines and is approved by the [EPA] Administrator." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987). In Texas, the Texas Commission on Environmental Quality ("TCEQ") issues NPDES permits through the Texas Pollutant Discharge Elimination System ("TPDES") permitting program. *Kleinman v. City of Austin*, 310 F. Supp. 3d 770, 778 (W.D. Tex. 2018).

The CWA imposes strict liability for unauthorized discharges of pollutants under § 1311(a). *Id.* at 778. Property owners who negligently discharge pollutants into covered waters may face serious sanctions, including civil fines, criminal penalties, and injunctions. 33 U.S.C. § 1319. The EPA, Army Corps of Engineers ("Corps"),[2] and state agencies are primarily responsible for enforcing the CWA. *Id.* The EPA is tasked with policing violations after the fact, either by issuing orders demanding § 1331 compliance or bringing civil actions under the Act. *Id.*

Absent federal or state agency action, the Act also authorizes private citizens to sue to enforce its requirements. 33 U.S.C. § 1365(a). Under the "citizen suit" provision,

> any citizen may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

*Id.* If the plaintiff prevails, the district court may order injunctive relief, apply civil penalties against the violator up to $25,000 per day for each violation, and award attorneys' fees and costs to the plaintiff. *Id.* §§ 1365(a), (d).

## B. Facts and Allegations

Ragsdale lives on a 73-acre ranch at 1830 County Road 289 in Georgetown that has been in his family for generations. Trial Tr. (Dkt. 73) at 29:10, 34:10-16; Dkt. 56 at 2. JLM was the primary operator overseeing construction of a recreation vehicle park, the "Reagan Ridge RV Park," at 26690 Ronald Reagan Boulevard ("Construction Site"). Dkt. 56 at 2. The Construction Site is directly across County Road 289 from Ragsdale's property. *Id.*

Because the Construction Site was in the Edwards Aquifer Contributing Zone, JLM was required to obtain from the TCEQ a general permit to discharge stormwater associated with

---

[2] The Corps controls permits for the discharge of dredged or fill material into covered waters. 33 U.S.C. § 1344(a).

construction activities. Pl.'s Ex. 1. On June 7, 2021, JLM obtained its permit, which authorized the discharge of stormwater from the Construction Site under the terms and conditions of TCEQ's general stormwater permit. Pl. Ex. 3 at 37. JLM's stormwater permit application lists the North Fork San Gabriel River, a freshwater stream, as the body of water "to receive the stormwater runoff or potential runoff from the site." *Id.* at 12; Pl. Ex. 2 at 4. The stormwater permit requires JLM to (1) design, install, and maintain effective erosion and sediment controls to minimize the discharge of pollutants; (2) maintain all protective measures identified in JLM's Stormwater Pollution Prevention Plan ("SWPPP") in effective operating condition; and (3) remove accumulations of sediment and debris that escape the site. Pl. Ex. 1.

After construction began, Ragsdale saw sediment-laden stormwater draining off the Construction Site, across County Road 289, and onto his property. Ragsdale alleged that the sediment from the stormwater has accumulated on his pastures and in a stock tank on his property. Amended Complaint, Dkt. 22 ¶ 43.

On July 12, 2021, Ragsdale sent a complaint to the TCEQ accusing JLM of violating the terms of its stormwater permit by failing to maintain effective erosion and sediment controls on the Construction Site. Pl. Ex. 11 at 2-3. The TCEQ investigated and found that silt fence maintenance was needed at the site for "effective erosion controls and sediment controls." Pl. Ex. 14. The TCEQ's "recommended corrective action" directed JLM to: "Submit photographic documentation that demonstrates maintenance of silt fence has been conducted and/or improvements have been implemented." *Id.* JLM submitted photographs to the TCEQ on September 2, 2021, showing that "maintenance had been performed on the silt fence and stabilized construction entrance." *Id.* The TCEQ sent JLM a compliance letter on October 7, 2021, concluding that "no violations are being alleged as a result of the investigation." Pl. Ex. 13.

Ragsdale sent another complaint to the TCEQ on February 14, 2022, and the TCEQ conducted another investigation, finding that the Construction Site had damaged silt fences and sediment buildup but "no signs of discharge." Pl. Ex. 15 at 2. The TCEQ asked JLM to submit its SWPPP, inspection reports, and photographs of the repaired fence. *Id.* JLM complied with the letter within seven days. *Id.* at 3. The TCEQ did not pursue any further action against JLM.

## C. Procedural History

Ragsdale filed this enforcement action against JLM on December 22, 2021, under the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a)(1). Dkt. 1.[3] In his Amended Complaint, Ragsdale alleged that JLM's discharges of stormwater onto his property violated CWA § 1311. Dkt. 22 ¶ 43. Specifically, he alleged that JLM violated § 1311(a) and the conditions of its TCEQ Stormwater Permit by (1) failing to maintain stormwater pollution prevention and control measures identified in its SWPPP; (2) failing to remove sediment and debris that accumulated on his property; and (3) failing to conduct inspections and properly document incidents of discharge and noncompliance. *Id.* ¶¶ 47-62.

Ragsdale alleged that sediment from the stormwater has accumulated on his pastures and in a stock tank on his property, and that JLM has not removed the sediment from his property. *Id.* ¶ 43. He alleged that if the stock tank were to overflow, the stormwater would make its way to a wet-weather creek on his property, which he contends is a tributary to the North Fork San Gabriel River. *Id.* Ragsdale states that the wet-weather creek ultimately feeds into the North Fork San Gabriel River about two miles south of his property. *Id.*; Dkt. 76 at 8. He alleged that these violations "irreparably harm the waters of the United States in the North Fork San Gabriel River watershed, as well as Mr. Ragsdale and his property." *Id.* ¶ 67. He seeks a declaratory judgment

---

[3] Ragsdale originally brought this action against JLM and Reagan Ridge RV, LLC, owner of the RV park. Dkt. 1. Ragsdale settled with Reagan Ridge, and the District Court dismissed it from the case. Dkt. 49.

that JLM has violated the Clean Water Act, injunctive relief to ensure that JLM prevents the recurring discharge of polluted stormwater and addresses the local environmental effects of the recurring discharges, civil penalties of up to $56,460 per violation (for a total of $101,119,860), and attorneys' fees and costs. Dkt. 74 at 26-29.

In accordance with the provisions of 28 U.S.C. § 636(c), the parties consented to have a United States Magistrate Judge conduct all remaining proceedings in the case, including trial and the entry of judgment. Dkts. 14, 15. The District Court transferred the case to this Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1), Federal Rule of Civil Procedure 73, and Rule CV-72 of the Local Rules of the United States District Court for the Western District of Texas.

Ragsdale moved for summary judgment under Rule 56. Dkt. 48. This Court denied that motion, finding that material fact issues were disputed. Dkt. 58. JLM filed no dispositive motions.

The case proceeded to trial on December 4 and 6, 2023. After the parties rested but before presenting their closing arguments, they filed their Amended Proposed Findings of Fact and Conclusions of Law, and Ragsdale submitted a response brief. Dkts. 74-76.

In its post-trial brief, JLM argues, for the first time, that under the Supreme Court's holding in *Sackett v. Env't Prot. Agency*, 598 U.S. 651 (2023), "Plaintiff has no viable claim under the CWA" because "Plaintiff's property is neither adjacent to nor adjoining any 'navigable waters' or other 'waters of the United States' protected by the CWA." Dkt. 75 at 2. Although the Supreme Court decided *Sackett* on May 25, 2023, long before trial, JLM did not make this argument until February 9, 2024—more than eight months after the opinion issued and two months after the bench trial. On February 26, 2024, Ragsdale and JLM presented oral argument to the Court on whether *Sackett* precludes Ragsdale's claims.

Although JLM was clearly dilatory in making this argument, the Court first addresses whether the waters at issue are covered under the Clean Water Act because it is a threshold that Ragsdale must cross to prevail. *Rapanos v. United States*, 547 U.S. 715, 757 (2006) (directing lower courts to determine "in the first instance" whether the waters at issue are "waters of the United States" under the CWA); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 115 (2018) (stating that "[t]he statutory term 'waters of the United States' delineates the geographic reach of many of the Act's substantive provisions," including the permitting program outlined in § 1311(a)).

## II. Defining "the Waters of the United States"

Clean Water Act Section 1311(a) prohibits the discharge of any pollutant into "navigable waters," which the Act defines as "the waters of the United States, including the territorial seas." *Id.* §§ 1311(a), 1342(a)(1), 1362(12). Because the Act does not define "the waters of the United States," the agencies responsible for enforcing it—the Corps and the EPA—have promulgated regulations in recent decades attempting to define that phrase. "As it turns out, defining that statutory phrase—a central component of the Clean Water Act—is a contentious and difficult task." *Nat'l Ass'n of Mfrs.*, 583 U.S. at 116. For that reason, "the outer boundaries of the Act's geographical reach have been uncertain from the start. The Act applies to 'the waters of the United States,' but what does that mean?" *Sackett*, 598 U.S. at 658.

> For more than a half century, the agencies responsible for enforcing the Act have wrestled with the problem and adopted varying interpretations. On three prior occasions, this Court has tried to clarify the meaning of "the waters of the United States." But the problem persists. When we last addressed the question 17 years ago, we were unable to agree on an opinion of the Court. Today, we return to the problem and attempt to identify with greater clarity what the Act means by "the waters of the United States."

*Id.* at 659 (footnote omitted). This case is steeped in those muddy waters.

Before enactment of the CWA in 1972, the Supreme Court interpreted the phrase "navigable waters of the United States" in the Act's predecessor statutes to refer to "interstate waters that are 'navigable in fact' or readily susceptible of being rendered so." *Rapanos*, 547 U.S. at 723 (quoting *The Daniel Ball*, 77 U.S. 557, 563 (1871)). After passage of the CWA, the Corps initially adopted this traditional judicial definition for the Act's term "navigable waters." *Rapanos*, 547 U.S. at 723. But the Corps' narrow definition did not last, and it soon promulgated new, much broader definitions of "the waters of the United States." *Sackett*, 598 U.S. at 664.

Those ensuing definitions interpreted "the waters of the United States" to include not only traditional navigable waters, but also "tributaries of such waters, interstate waters and their tributaries, and nonnavigable intrastate waters whose use or misuse could affect interstate commerce." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 123 (1985). Those definitions also defined waters of the United States to include "all freshwater wetlands" that were "adjacent" to other covered waters. *Id.* at 24 (quoting 33 C.F.R. § 209.120(d) (1976)).

## A. Riverside Bayview

The Supreme Court first construed the meaning of "the waters of the United States" when it considered whether the Corps had jurisdiction over wetlands "adjacent" to traditional navigable waters. *Riverside Bayview*, 474 U.S. at 124. The Court concluded that "the language, policies, and history of the Clean Water Act compel a finding" that waters of the United States includes wetlands adjacent to traditional navigable waters. *Id.* at 131. Because the landowner's property was part of a wetland that "actually abut[ted] on a navigable waterway," the Court found that it was waters of the United States under the Act. *Id.* at 135. The Court reasoned that Congress intended "to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Id.* at 133 (citing S. Conf. Rep. No. 92-1236, p. 144 (1972); 118 Cong. Rec. 33756-57 (1972)).

**B. SWANCC**

After *Riverside Bayview*, the agencies adopted even broader definitions of "waters of the United States." *Rapanos*, 547 U.S. at 725. In 1986, for example,

> the Corps announced the so-called "Migratory Bird Rule," which purported to extend its jurisdiction to any intrastate waters which are or would be used as habitat by migratory birds. In addition, the Corps interpreted its own regulations to include "ephemeral streams" and "drainage ditches" as "tributaries" that are part of the "waters of the United States," provided that they have a perceptible "ordinary high water mark" as defined in § 328.3(e). This interpretation extended "the waters of the United States" to virtually any land feature over which rainwater or drainage passes and leaves a visible mark—even if only "the presence of litter and debris." . . . [L]ower courts upheld the application of this expansive definition of "tributaries" to such entities as storm sewers that contained flow to covered waters during heavy rainfall, and dry arroyos connected to remote waters through the flow of groundwater over "centuries."

*Id.* (cleaned up).

In *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 164 (2001) ("*SWANCC*"), the Court considered application of the Migratory Bird Rule to an abandoned gravel mining pit in northern Illinois. The Corps argued that the abandoned mining pit qualified as waters of the United States because it contained seasonal ponds used as habitat by migratory birds that cross state lines. *Id.* at 164-65. In so arguing, the Corps relied on its previous regulations defining waters of the United States to include "isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce." *Id.* at 168 (quoting 33 C.F.R. § 323.2(a)(5) (1978)).

The Supreme Court held that the Migratory Bird Rule was not supported by the Clean Water Act and the Act did not apply to seasonal isolated ponds "that are *not* adjacent to open water." *Id.* at 168. The Court reasoned that "[t]he term 'navigable' has at least the import of showing us what

Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id.* at 172. The Court found that permitting respondents to claim federal jurisdiction over ponds and mudflats falling within the Migratory Bird Rule "would result in a significant impingement of the States' traditional and primary power over land and water use." *Id.* at 174.

## C. Rapanos

After *SWANCC*, the Corps issued regulations interpreting "the waters of the United States" to include, in addition to traditional interstate navigable waters, (1) "all interstate waters including wetlands"; (2) "all other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce"; (3) "tributaries of such waters"; and (4) "wetlands adjacent to such waters and tributaries." *Rapanos*, 547 U.S. at 724 (citations omitted). The Corps interpreted "tributaries" to include "ephemeral streams," "drainage ditches," and typically dry land features such as "arroyos, coulees and washes" that might have little water flow in a given year, "provided that they ha[d] a perceptible ordinary high water mark." *Id.* at 725-27 (citations omitted). The Corps also defined "adjacent" wetlands broadly to include "bordering, contiguous or neighboring" traditional navigable waters. *Id.* at 724.

In *Rapanos*, the Court considered "whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters, constitute 'waters of the United States' within the meaning of the Act." *Id.* at 729. The Corps alleged that the wetlands, which had "sometimes-saturated soil conditions," were waters of the United States because they were "adjacent" to navigable waters, in that they were near ditches and drains that eventually emptied into traditional navigable waters eleven to twenty miles away. *Id.* at 729-30. It was unclear

whether the connections between the wetlands and the nearby drains and ditches were continuous or intermittent, or if the nearby drains and ditches contained continuous or merely occasional flows of water. *Id.* at 729. The Sixth Circuit found that there was federal jurisdiction over the wetlands because they were "adjacent to neighboring tributaries of navigable waters" and had a "significant nexus" to waters of the United States. *Id.* at 730.

The Supreme Court reversed, finding that "'the waters of the United States' in § 1362(7) cannot bear the expansive meaning that the Corps would give it." *Id.* at 731-32. A majority of justices could not agree on what the definition should be, but a plurality concluded that it:

> includes only those **relatively permanent**, standing or continuously flowing bodies of water "forming geographical features" that are described in ordinary parlance as "streams, oceans, rivers and lakes." **The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall**. The corps' expansive interpretation of the "the waters of the United States" is thus not based on a permissible construction on of the statute.

*Id.* at 739 (citations omitted) (emphasis added). The plurality explained that the terms "streams," "oceans," "rivers," "lakes," and "bodies" of water "forming geographical features"

> connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows. Even the least substantial of the definition's terms, namely, "streams," connotes a continuous flow of water in a permanent channel—especially when used in company with other terms such as "rivers," "lakes," and "oceans." **None of these terms encompasses transitory puddles or ephemeral flows of water**.
>
> The restriction of "the waters of the United States" to exclude channels containing merely intermittent or ephemeral flow also accords with the commonsense understanding of the term. In applying the definition to "ephemeral streams," "wet meadows," storm sewers and culverts, "directional sheet flow during storm events," drain tiles, man-made drainage ditches, and dry arroyos in the middle of the desert, the Corps has stretched the term "waters of the United States" beyond parody. The plain language of the statute simply does not authorize this "Land Is Waters" approach to federal jurisdiction.

*Id.* at 733 (emphasis added).

11

The plurality explained that by describing "waters" as "relatively permanent," they were not necessarily excluding "streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought," or "seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months—such as the 290-day, continuously flowing stream postulated by Justice Stevens' dissent." *Id.* at 733 n.5. The Court explained that "[c]ommon sense and common usage distinguish between a wash and seasonal river." *Id.* Although the plurality did not decide "exactly when the drying-up of a streambed is continuous and frequent enough to disqualify the channel as a 'water of the United States,'" the Court held that "'intermittent' and 'ephemeral' streams—that is, streams whose flow is 'coming and going at intervals . . . broken, fitful,' or 'existing only, or no longer, than, a day; diurnal . . . short-lived'—are not." *Id.* (cleaned up). The plurality stated that "intermittent streams" and "ephemeral streams" cannot be considered waters of the United States because "such entities constitute extant 'streams' only while they are 'continuously flowing;' and the usually dry channels that contain them are never 'streams.'" *Id.* at 733 n.6. The Court reasoned that "no one contends that federal jurisdiction appears and evaporates along with the water in such regularly dry channels." *Id.*

Applying this "relatively permanent" definition to adjacent wetlands, the plurality concluded that "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." *Id.* at 742. "Wetlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States'" are not wetlands covered under the Act. *Id.* Thus, to establish that adjacent wetlands are covered by the CWA, the enforcer must show that: (1) "the adjacent channel contains a 'wate[r] of the United States,' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable

waters);" and (2) "the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id.* The plurality remanded the case to the Sixth Circuit to make findings on those issues.

Justice Kennedy issued a concurring opinion advocating that instead of the plurality's "relatively permanent" test, the Court use the "significant nexus" test to decide whether wetlands or waters are covered on a case-by-case basis by finding whether they, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 779-80 (Kennedy, J., concurring).

**D. Sackett**

Because a majority of the justices could not agree on a definitive definition of "the waters of the United States" in *Rapanos*, the agencies and lower courts continued to use both the "relatively permanent" and "significant nexus" tests. *San Francisco Baykeeper v. City of Sunnyvale*, No. 5:20-CV-824-EJD, 2023 WL 8587610, at * 2 (N.D. Cal. Dec. 11, 2023).

In January 2023, the EPA issued a new regulation redefining "waters of the United States" to include tributaries "(i) [t]hat are relatively permanent, standing or continuously flowing bodies of water; or (ii) [t]hat either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of waters identified in paragraph (a)(1) of this section." Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004, 3142 (Jan. 18, 2023). This rule also included "intrastate lakes and ponds, streams, or wetlands" with either a continuous surface connection to categorically included waters or a significant nexus to interstate or traditional navigable waters. *Id.* "Adjacent" was defined as "bordering, contiguous, or neighboring," and the definition specifically included wetlands "separated from other waters of

the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like" as "adjacent wetlands." *Id.* at 3143.

In *Sackett*, petitioners Michael and Chantell Sackett bought property near Priest Lake, Idaho, and began backfilling their lot with dirt and rocks in preparation for building a home. *Id.* at 662. A few months later, the EPA sent the Sacketts a compliance order informing them that their property contained protected wetlands and their backfilling violated § 1311(a) of the CWA. According to the EPA, the "wetlands" on the Sacketts' lot were covered because there were near, but separated by a 30-foot road from, an unnamed tributary, which fed into a non-navigable creek, which ran into Priest Lake, an intrastate body of water. *Id.* at 662-63; *see also id.* at 707 (Thomas, J., concurring) (explaining that the "so-called 'tributary' (really, a roadside ditch) across the street from the Sacketts' property is not a water of the United States because it is not, has never been, and cannot reasonably be made a highway of interstate or foreign commerce"). To establish a "significant nexus," the EPA lumped the petitioner's lot together with a large nearby wetland complex it regarded as "similarly situated." *Id.* at 663. According to the EPA, these properties taken together "significantly affected" the ecology of Priest Lake, so it concluded that the Sacketts had illegally dumped soil and gravel into waters of the United States. *Id.*

The Sacketts sued under the Administrative Procedure Act, alleging that "the EPA lacked jurisdiction because any wetlands on their property were not 'waters of the United States.'" *Id.* at 663. The district court entered summary judgment for the EPA and the Ninth Circuit affirmed, finding that "the CWA covers adjacent wetlands with a significant nexus to traditional navigable waters and that the [petitioners'] lot satisfied that standard." *Id.* The Court granted certiorari to determine whether the Sacketts' wetlands fell within the jurisdiction of the CWA. *Id.* at 663.

The Court unanimously concluded that the *Rapanos* plurality was correct that "the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water forming geographic[al] features that are described in ordinary parlance as streams, oceans, rivers, and lakes.'" *Id.* at 671 (quoting *Rapanos*, 547 at 739). In other words, the Supreme Court jettisoned the "significant nexus" standard from Justice Kennedy's concurrence in *Rapanos* and expressly adopted the "relatively permanent" standard from the plurality opinion.

The Court reasoned that the "relatively permanent" definition "follows from the CWA's deliberate use of the term 'waters,'" which "typically refers to bodies of water" like streams, oceans, rivers, and lakes. *Id.* The Court explained that the relatively permanent standard "helps to align the meaning of 'the waters of the United States' with the term it is defining: 'navigable waters.'" *Id.* at 672.

> Although we have acknowledged that the CWA extends to more than traditional navigable waters, we have refused to read "navigable" out of the statute, holding that it at least shows that Congress was focused on "its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." At a minimum, then, the use of "navigable" signals that the definition principally refers to bodies of navigable water like rivers, lakes, and oceans.

*Id.* The Court rejected the EPA's argument that it "had jurisdiction over anything defined by the presence of water." *Id.* at 674. The Court found that reading would cover waters it had determined did not qualify, such as "isolated ponds." *Id.* (citing *SWANCC*, 531 U.S. at 171).

Applying the "relatively permanent" definition to adjacent wetlands, the Court ruled that the CWA extends to only wetlands that are "as a practicable matter indistinguishable from waters of the United States." *Id.* at 678 (quoting *Rapanos*, 547 U.S. at 755). Thus, the Court adopted the *Rapanos* plurality's test requiring the party asserting jurisdiction over adjacent wetlands to establish that the adjacent body of water constitutes waters of the United States, and that "the

wetland has a continuous surface connection with that water." *Id.* at 678-79 (quoting *Rapanos*, 547 U.S. at 742).

Applying this test to the wetlands on Sacketts' property, the Court held that they were not subject to the CWA, even though the wetlands were in the same neighborhood as the unnamed tributary and were near a large wetland complex. The Court found that the subject wetlands were distinguishable from any possibly covered waters because they were located across a 30-foot road from the unnamed tributary, which fed into a non-navigable creek, which fed into an intrastate lake. *Id.* at 684.

Following *Sackett*, the EPA revised the definition to remove the "significant nexus" standard and replace it with the "relatively permanent" standard. Under the revised regulations, "the waters of the United States" ***includes***:

1. territorial seas, interstate waters, or waters which are susceptible to use in interstate or foreign commerce including being tidally influenced

2. impoundments of waters defined as waters of the United States;

3. **tributaries of waters** defined as waters of the United States under categories 1 and 2 **"that are relatively permanent, standing or continuously flowing bodies of water**";

4. wetlands adjacent to waters defined as waters of the United States under category 1, or adjacent to waters defined as waters of the United States under categories 2 and 3 with a continuous surface connection to those waters; and

5. intrastate lakes and ponds that are relatively permanent, standing or continuously flowing bodies of water with a continuous surface connection to waters defined as waters of the United States.

40 C.F.R. § 120.2(a) (Sept. 8. 2023) (emphasis added). The regulation ***excludes***:

1. "Ditches (including roadside ditches) excavated wholly in and draining only dry land and that do not carry a relatively permanent flow of water";

2. "Artificial lakes or ponds created by excavating or diking dry land to collect and retain water and which are used exclusively for such purposes as stock watering, irrigation, settling basins, or rice growing";

3. "Waterfilled depressions created in dry land incidental to construction activity and pits excavated in dry land for the purpose of obtaining fill, sand, or gravel unless and until the construction or excavation operation is abandoned and the resulting body of water meets the definition of waters of the United States"; and

4. "Swales and erosional features (e.g., gullies, small washes) characterized by low volume, infrequent, or short duration flow."

*Id.* § 120.2(b).

### E. Conclusion as to the Definition of "the Waters of the United States"

This Court is bound by the *Sackett* decision,[4] which defines waters of the United States as "only those relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary parlance as streams, oceans, rivers and lakes." 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739) (cleaned up). Relevant here, the definition "does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Rapanos*, 547 U.S. at 739.

### III.   Findings and Conclusions

Based on *Sackett* and the EPA's September 2023 rule, JLM now argues that the wet-weather creek on Ragsdale's property is not "waters of the United States" because it is not "a relatively permanent, standing or continuous flowing body of water." Dkt. 75 at 4. JLM also argues that the stock tank on Ragsdale's property, drainage ditches, stormwater culverts, and trenches do not qualify. *Id.*; 40 C.F.R. § 120.2(a). JLM contends that, because none of the alleged discharges in this case involve waters of the United States, Ragsdale has no viable CWA claim.[5]

---

[4] *See Harper v. Virginia Dep't of Tax'n*, 509 U.S. 86, 97 (1993) ("When [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."); *see also Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, No. 219-050, 2024 WL 1088585, at *4 (S.D. Ga. Mar. 1, 2024) ("Because the Supreme Court applied a rule of federal law—its interpretation of the CWA—to the parties before it in *Sackett*, this Court must give full retroactive effect to the decision.").

[5] JLM also argues that the Court lacks subject matter jurisdiction because Ragsdale fails to establish that the wet-weather Creek is waters of the United States. But that determination does not impact this Court's

In response, Ragsdale concedes that the stock pond, drainage ditches, culverts, and trenches are not covered under the CWA. Dkt. 76 at 7. As to the wet-weather Creek, Ragsdale argues that he need not show that JLM discharged stormwater into waters of the United States to prove a violation of the CWA because he need only show that JLM violated the terms of its stormwater permit. Dkt. 76 at 5. Alternatively, Ragsdale argues that even if he is required to show that discharges of stormwater went into waters of the United States, he has done so. *Id.* The Court disagrees with both arguments.

## A.  Ragsdale Must Show Unlawful Discharges into the Waters of the United States

Ragsdale argues that he need not show that JLM discharged stormwater into waters of the United States to prove a violation of the CWA because he must show only that JLM violated the terms of its stormwater permit. Dkt. 76 at 5 (contending that his "claims that JLM violated conditions of its NPDES/TPDES stormwater permit are properly before this Court, without regard for whether any particular violation involved a discharge that actually reached a navigable water").

Ragsdale is correct that "private citizens may commence civil actions against any person 'alleged to be in violation of' the conditions of either a federal or state NPDES permit." *Gwaltney*, 484 U.S. at 53 (quoting § 1365(a)(1)); *see also EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 224 (1976) (stating that "all discharges (including federal dischargers) may be sued to enforce permit conditions, whether those conditions arise from standards and limitations

---

subject matter jurisdiction. "[T]he term 'jurisdiction' in the CWA context refers to statutory jurisdiction, or the bodies of water where the CWA can be enforced, not subject-matter jurisdiction. . . . Instead, *Sackett* and *Rapanos* establish that defining a body of water as a ['water of the United States'] is more accurately treated as an element of a claim for relief under the CWA." *Inland Empire Waterkeeper v. Corona Clay Co.*, No. 8:18-cv-333-DOC, 2023 WL 8125772, at *2 (C.D. Cal. Oct. 26, 2023); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case."). The Court has subject matter jurisdiction over this case because it arises under the laws of the United States, 28 U.S.C. § 1331, and Congress granted federal district courts jurisdiction over citizen suits under the CWA. 33 U.S.C. § 1365(a).

promulgated by the Administrator or from stricter standards established by the State"). But to prevail under the CWA, a plaintiff must show that the alleged violations involved discharges of pollutants into waters of the United States. *See Sackett*, 598 U.S. at 661 (stating that "the CWA prohibits the discharge of pollutants into only 'navigable waters,' which it defines as 'the waters of the United States'"); *Rapanos*, 547 U.S. at 732, 745 (stating that "the CWA authorizes federal jurisdiction only over 'waters'" and that "the agency must prove that the contaminant-laden waters ultimately reach covered waters"). This was true even before *Sackett*.[6]

In support of his argument that he need not show that JLM discharged pollutants into the waters of the United States to succeed on his CWA claims, Ragsdale relies on *Nw. Env't Advocs. v. City of Portland*, 56 F.3d 979 (9th Cir. 1995), and *Connecticut Fund For Env't v. Raymark Indus., Inc.*,

---

[6] *See Gwaltney*, 484 U.S. at 52 (stating that § 1311(a) of the CWA "makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act"); *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 836 (9th Cir. 2021) ("To be sure, the CWA vests district courts with jurisdiction over a citizen suit only upon proof of discharge into the navigable waters of the United States."); *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) (stating that claims under the citizen suit provision not aimed at protecting "navigable rivers and streams from pollution . . . fall outside the zone of interests protected by the CWA"); *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 360-61 (5th Cir. 1996) ("In a citizen suit under the Clean Water Act the plaintiff must demonstrate that a defendant has (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that (3) the pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs."); *Citizens Coordinating Comm. on Friendship Heights, Inc. v. Wash. Metro. Area Transit Auth.*, 765 F.2d 1169, 1173 (D.C. Cir. 1985) (holding that corporation lacked standing under § 1365(a) of the CWA to complain of injury from seepage of diesel fuel into its ground water collection system and elevator pit because the CWA "was enacted not to create a federal tort of subterranean trespass but to protect navigable rivers and streams from pollution, and to require those who desire to discharge pollutants into the waterways to obtain a permit for doing so"); *Bernard v. City of Lafayette*, No. 6:17-CV-1326, 2018 WL 1599533, at *4 (W.D. La. Feb. 27, 2018) (finding that plaintiff failed to state a claim under the CWA when allegations involved discharge of improperly treated sewage onto his personal property, not into waters of the United States), *R. & R. adopted*, 2018 WL 1597737 (W.D. La. Apr. 2, 2018); *Apalachicola Riverkeeper v. Taylor Energy Co.*, 954 F. Supp. 2d 448, 454 (E.D. La. 2013) ("To succeed on a § 1365 citizen suit to enforce § 1311, a plaintiff must establish three elements: (1) that the defendant unlawfully discharged or is discharging a 'pollutant'; (2) that the discharge emanated or is emanating from a 'point source'; and (3) that the pollutant was discharged or is being discharged into 'navigable waters.'"); *United States v. Brink*, 795 F. Supp. 2d 565, 576 (S.D. Tex. 2011) ("To establish a violation of the CWA, the United States need only show (a) that it has jurisdiction over the subject waters, (b) that the defendants discharged or placed fill in those waters, and (c) that the defendants did so without a permit from the Corps.").

631 F. Supp. 1283, 1285 (D. Conn. 1986)). Both cases involved undisputed covered navigable waters under the CWA. Neither held that a plaintiff is not required to show that pollutants were discharged into waters of the United States to prevail under the CWA. Ragsdale also relies on *State Water Res. Control Bd.*, which is similarly unavailing. *See id.*, 426 U.S. at 208 (stating that "Congress also provided that a State may issue NPDES permits for discharges into navigable waters within its jurisdiction"). The cases Ragsdale cites do not support the proposition that he need not show the wet-weather creek is a covered water under the CWA. To the contrary, the Supreme Court—which this Court is bound to follow—has unequivocally stated that "the CWA prohibits the discharge of pollutants into *only* 'navigable waters,' which it defines as 'the waters of the United States.'" *Sackett*, 598 U.S. at 661.

## B.  The Wet-Weather Creek Is Not "Waters of the United States"

In the alternative, Ragsdale argues that the wet-weather creek is covered under the CWA. He testified that the wet-weather creek enters his property on its northwest corner, winds through trees, and exits his property on its southernmost border. Trial Tr. (Dkt. 73) at 31:1-32:1-7, 96:20-25; Pl. Ex. 84 (County Appraisal Map). Ragsdale relies on a U.S. Geological Survey map to show that the wet-weather creek eventually feeds into the North Fork San Gabriel River two miles south of his property. Pl. Ex. 83. He argues that the wet-weather creek is a water of the State under the Texas Water Code, which defines "water" or "water in the state" to mean:

> groundwater, percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, wetlands, marshes, inlets, canals, the Gulf of Mexico, inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, ***navigable or nonnavigable***, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state.

TEX. WATER CODE § 26.001(5) (emphasis added).

More to the point, given that his claim is asserted under a federal statute, Ragsdale also argues that the creek is a covered tributary under the CWA because (1) JLM's SWPPP identifies the "receiving waters" at or near the Construction Site as a "tributary" to the North Fork San Gabriel River, Dkt. 76 at 8 (quoting Pl. Ex. 3 at 12); (2) the creek appears on the U.S. Geological Survey map, "which shows its confluence with the North Fork San Gabriel is less than two miles downstream from Mr. Ragsdale's property," *id.* (citing Pl. Ex. 83); (3) "the creek, though relatively small, has bed and banks, and a high-water mark indicated by both the vegetation, as well as the sediment deposited on the banks, which is visible in a photograph taken by Mr. Ragsdale," *id.* (citing Pl. Ex. 86); and (4) "Photographs taken by Mr. Ragsdale show water in the creek twice during 2021," during the time that JLM was covered by the General Permit," *id.* (citing Pl. Exs. 86, 115).

This evidence does not show that the wet-weather creek is "waters of the United States" under the CWA as defined by the Supreme Court in *Sackett* and *Rapanos*. The undisputed evidence shows that the wet-weather creek is not a "relatively permanent, standing or continuously flowing body of water" but rather, as its name implies, an "intermittent" or "ephemeral"[7] channel providing drainage for rainfall a few times a year. *Sackett*, 598 U.S. at 671; *Rapanos*, 547 U.S. at 739.

For example, the two photographs Ragsdale relies on to support his argument that the wet-weather creek is waters of the United States show a narrow channel appearing to be a couple of feet wide and a few inches deep:

---

[7] An "ephemeral stream" is "a stream that flows only briefly during and following a period of rainfall in the immediate locality." MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/ephemeral%20stream (last visited June 11, 2024).

 

Pl. Exs. 86, 115. Ragsdale testified that he took these photographs right after it rained. Trial Tr.

(Dkt. 73) at 46:17-19, 62:18-19. Most record photos and videos of the creek show dry land, with

very little in the way of identifiable indentations, beds, or banks. Pl. Exs. 86-92, 95, 109, 112, 113,

114, 116, 117, 118, 171, 172. And Ragsdale's testimony at trial supports the statement in his brief

that the wet-weather creek only had water in it twice in 2021, after substantial rain. *See* Trial Tr.

(Dkt. 73) at 41:8-14 (he observed stormwater runoff during substantial rains); 46:17-19 (he took

the photo of the creek depicted in Pl. Ex. 86 after a rain event); 47:20-22 (he noticed sediment in

the dry creek (Pl. Ex. 88) after a rain event); 50:18-23 (he noticed sediment in the dry creek

(Pl. Ex. 95) after a rain event); 62:13-25 (he took photos of dried sediment in the creek (Pl. Ex.

116, 117) after rains). In addition, while the videos Ragsdale introduced show stormwater running

off the Construction Site and spreading onto his pastures and toward his stock tank during heavy

rain events, they only show that water could have been in the wet-weather creek during heavy

rains. Pl. Exs. 131, 145, 155.

Based on this evidence, the Court finds that the wet-weather creek is not "a relatively

permanent, standing or continuously flowing body of water" that can be described in ordinary

parlance as a "stream" or "river." *Sackett*, 598 U.S. at 671. Instead, the creek is an "ordinarily dry channel[] through which water occasionally or intermittently flows" and is not waters of the United States under the Clean Water Act. *Rapanos*, 547 U.S. at 733.[8]

In addition to not proving that the wet-weather creek is "the waters of the United States" under the CWA, Ragsdale offered no evidence that stormwater from the JLM Construction Site ever actually entered the North Fork San Gabriel River or entered the creek on the southern portion of his property (south of the culverts off County Road 289 and the stock tank) and exited his property. *See, e.g.*, Trial Tr. (Dkt. 73) at 52:20-53:3 (describing photo (Pl. Ex. 99) showing drainage "toward" creek); *id.* at 67:18-23 (describing photo (Pl. Ex. 127) showing drainage "toward" creek). In fact, Ragsdale testified that he had not seen sediment from the stormwater on "the southernmost portions of the wet weather creek . . . because I haven't been there in some time." Trial Tr. (Dkt. 73) at 122:1-12; *see also* Trial Tr. (Dkt 72) at 49:11-20 (JLM president David Marshall stating there was no evidence the storm water "ever made it to the wet weather creek"); Pl. Ex. 100.

Ragsdale testified that he was concerned that *if* his stock tank overflowed, the "sediment *could* be released into the wet weather creek" and eventually enter the North Fork San Gabriel River two miles south of his property. Bue he admitted that this never happened. Trial Tr. (Dkt. 73) at 84:15-18; *see also id.* at 80:15-24 (stating that the stock tank had not overflowed since 2018).[9]

---

[8] While the definition of "the waters of the United States" does not necessarily exclude seasonal rivers, which flow continuously during some months of the year but not during dry months (such as the 290-day, continuously flowing stream referenced in *Rapanos*), the wet-weather creek does not qualify as such a river because the record shows that it carried water only a few times a year after substantial rain events. *See Rapanos*, 747 U.S. at 732 n.5; *cf. Brink*, 795 F. Supp. 2d at 578 (finding that a seasonal creek was a covered water where it was a "relatively permanent watercourse" rather than an "intermittent and ephemeral waterway") (citations omitted).

[9] Ragsdale testified that the stock tank was installed by his father to collect stormwater runoff from County Road 289. Trial Tr. (Dkt. 73) at 92:15-93:1-2.

For these reasons, Ragsdale has not shown that JLM discharged pollutants into "the waters of the United States," which is required to show a violation of Section 1311(a) of the Clean Water Act. *Rapanos*, 547 U.S. at 745 (stating that enforcer "must prove that the contaminant-laden waters ultimately reach covered waters"); *Citizens Coordinating Comm. on Friendship Heights, Inc. v. Wash. Metro. Area Transit Auth.*, 765 F.2d 1169, 1173 (D.C. Cir. 1985) (holding that plaintiff lacked standing to assert CWA claim against polluter when injury involved fuel seepage into ground water collection system and elevator pit, not into navigable waters as defined under the Act); *Bernard*, 2018 WL 1599533, at *4 (finding that plaintiff failed to state a claim under the CWA when allegations involved discharge of improperly treated sewage onto plaintiff's personal property and not into waters of the United States); *Apalachicola Riverkeeper v. Taylor Energy Co.*, 954 F. Supp. 2d 448, 454 (E.D. La. 2013) ("To succeed on a § 1365 citizen suit to enforce § 1311, a plaintiff must establish . . . that the pollutant was discharged or is being discharged into 'navigable waters.'").

## IV.    Conclusion

Ragsdale alleges that his property has suffered aesthetic and recreational damage from sediment-laden stormwater. He testified that he is pursuing this lawsuit not for money, but: "Because I feel like my property has been damaged. I feel like there is a wrong that needs to be righted." Trial Tr. (Dkt. 73) at 84:10-14.

While the Court is sympathetic that sediment from JLM's Construction Site has accumulated on his ranch and in his stock tank, "the CWA was enacted not to create a federal tort . . . but to protect navigable rivers and streams from pollution." *Citizens Coordinating Comm.*, 765 F.2d at 1173 (finding that plaintiff's allegation of fuel seepage into his basement "was a trespass, actionable at common law, and not pollution of a stream without a permit, actionable under the Clean Water Act").

Because Ragsdale has not shown that any stormwater from JLM's Construction Site was discharged into the navigable waters of the United States as defined by the CWA and interpreted by the Supreme Court, he has not proven his case under the CWA. For these reasons, the Court must enter judgment for JLM.[10]

    **SIGNED** on June 11, 2024.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE

---

[10] The Court will enter a final judgment in a separate order.